**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF LOUISIANA**

IN RE:                                                     CASE NO. 18-10017

**MICHAEL ALLEN WORLEY**
   *Debtor*                                          CHAPTER 11
****************************************************************************
**MICHAEL ALLEN WORLEY**
   *Plaintiff*

VERSUS                                                  ADVERSARY NO. 18-1023

**WORLEY CLAIMS SERVICES, LLC**
   *Defendant*
****************************************************************************

**MOTION FOR PRELIMINARY INJUNCTION TO PREVENT**
**THE ENFORCEMENT OF RESTRICTIVE COVENANTS**

**NOW INTO COURT** comes Michael A. Worley ("Mike Worley" or "Debtor"), as Debtor-in-Possession in the above-captioned Chapter 11 case, through the undersigned counsel, who, pursuant to Fed. R. Civ. P. 65, Fed. R. Bankr. P. 7065, 11 U.S.C. § 362(a) and § 525(a), requests that this Honorable Court use its authority to prevent Worley Claims Services, LLC ("WCS" or "Defendant"), made defendant herein, from enforcing against the Debtor certain restrictive covenants contained in the agreements described below between the Debtor and Defendant, for the following reasons:

**JURISDICTION AND VENUE**

1.

This Court has jurisdiction over this matter pursuant to the provisions of 28 USC §§ 157(b)(1) and 1334. The Court's consideration of this Motion is a core proceeding under 28 U.S.C. §§ 157 (b)(2)(B) and 157(b)(2)(C). Moreover, as the list of core proceedings under Section 157 is not exclusive, the Debtor shows that this matter should be considered as a core proceeding due

to its tremendous impact on the Debtor's ability to earn a living, fund his Chapter 11 Plan and pay his creditors. Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.

WCS was founded in 1976 by Mike Worley's father. Debtor went to work for the WCS in May, 1984, after graduating from LSU. After several years working with WCS, Debtor convinced his father to move towards a catastrophic claims management company. So it began hiring adjusters and managers, began a training department, and began growing the company in that direction.

3.

By 1998, WCS had grown to around four hundred (400) fulltime adjusters. By 2005, WCS had grown to around one thousand two hundred (1,200) fulltime adjusters. In 2008, half the company was sold to Seaport Capital Partners ("Seaport") of New York (an equity company) for around Fifty Million Dollars ($50M). Debtor's father got half that money and retired from the business. The Debtor received the other half and stayed with the business and maintained forty-nine percent (49%) ownership of the company.

4.

WCS continued to grow, and working on such events as the BP Oil Spill in 2010 and 2011, the company had two big years. As a result, Seaport took cash back from the sale of the company.

5.

In 2014, WCS ran an auction process and sold the company again. The company was sold to Aquiline for around Two Hundred Twelve Million Dollars ($212M). The company had

considerable amount of debt on it and Debtor received around ($52M) before taxes – from which the Debtor paid taxes on the money and also paid off some debt.

6.

WCS retained Mike Worley as CEO for about a year and a half pursuant to an Amended and Restated Employment Agreement, dated October 14, 2014.  The company terminated his services as CEO, but continued as Chairman of the Board pursuant to a *Second Amended and Restated Employment Agreement* ("Second Employment Agreement") entered into in April, 2016.  Because certain of the referenced agreements contain confidentiality provisions, those documents will not be attached to this pleading, but will be shown in camera, unless and until an agreement is reached regarding the inclusion of the documents in the public record.

7.

When Aquiline bought the company – they mentioned they would continue distributions.  Debtor still had an ownership, he had Ten Million (10M) shares of stock in the company.  Aquiline represented that Debtor would continue to receive distributions.  Based on that, Debtor's distributions would have been around Three – Five Million Dollars ($3-5M) per year.

8.

However, during this period – WCS immediately started buying companies and didn't distribute any capital to the partners – which affected Debtor's income drastically.  WCS eventually reduced Debtor's salary down to around Six Hundred Thousand Dollars ($600K) in the last year he was with the company.

9.

Effective May 16, 2017, the Debtor entered into a *Separation Agreement* ("Separation Agreement") with Defendant under which he was to receive distributions, benefits and forgiveness

of loans. The Separation Agreement contains a confidentiality provision which the Debtor will ask the Court to review and rule on its application before presenting the Separation Agreement into evidence. On December 15, 2017, the Defendant discontinued any and all distributions, benefits and forgiveness of loans to Debtor claiming that as a result of an FBI investigation beginning in September, 2017, that Defendant was no longer obliged to meet its obligations under the Separation Agreement.

10.

The basis for Defendant's right to discontinue its obligations under the Separation Agreement was caused by the Defendant.

11.

On or before September, 2017, one or more of Defendant's employees ("Defendant's Employees") approached the office of the Federal Bureau of Investigation in the Middle District of Louisiana ("FBI") for the purpose of attempting to make a criminal referral involving Debtor ("Criminal Referral").

12.

At one or more meetings with the FBI, Defendant's Employees provided financial data of the Defendant and offered statements to the FBI in an attempt to substantiate the Criminal Referral.

13.

All of the data and statements offered in an attempt to support the Criminal Referral were known to Defendant prior to the execution of the Separation Agreement as a result of disclosure to Defendant by Debtor on or before 2016.

14.

All of the data and statements offered in an attempt to support this Criminal Referral and all subsequent matters which were the subject matter of the Criminal Referral resulted in no financial loss whatsoever to the Defendant.

15.

Substantially all of the former executive management team previously hired by Debtor, while in charge of WCS, have been terminated by the Defendant. Additionally, substantially all catastrophic claims managers have either been terminated or have resigned.

16.

The management practices established by Debtor with regard to employment practices, bonuses, client relations and work practices of WCS have been abandoned by Defendant.

17.

The company that Debtor created no longer exists.

18.

The Debtor filed for relief under Chapter 11 of the U.S. Bankruptcy Code on January 8, 2018. Since that time he has been busy working on a liquidating plan to pay his creditors through the efficient sale of assets at their highest reasonably available value. He has also conferred with various professional contacts in the field of his expertise, claims services and management, regarding the possibility of his returning to work in that field. However, due to the Non-Competition provision of the Second Employment Agreement, the Debtor is concerned that he might be in violation of that provision if he were to work in the claims management business.

## RELIEF REQUESTED

19.

The Debtor shows that WCS has breached the Second Employment Agreement and the Separation Agreement (collectively, "Agreements") by terminating his benefits and payments thereunder. He has made amicable demand for those benefits and payments. He should be awarded damages in the amount of benefits and payments he is owed by WCS under the Agreements.

20.

Likewise, the Debtor is owed tax distributions for the last quarter of 2017.

21.

Likewise, the Debtor is owed an accounting of 2016 and 2017 tax distributions to him by WCS.

## BASIS FOR RELIEF

22.

The breaches by WCS of the Agreements were in bad faith. Consequently, WCS is liable for all the damages, foreseeable or not, that are a direct consequence of its failure to perform under the Agreements.

23.

Because of the breaches by WCS of the Agreements, the Debtor should be freed from any and all restrictions contained in the Agreements and allowed to work in the field of claim services and management. A preliminary injunction should be issued followed by a permanent injunction to that effect.

## LAW AND ARGUMENT

24.

*A PRELIMINARY INJUNCTION IS NECESSARY TO GIVE EFFECT TO THE DEBTOR'S PROTECTIONS UNDER THE BANKRUPTCY CODE*

11 U.S.C. § 105(a) authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" Title 11.

25.

Courts may grant preliminary injunctive relief under Fed. R. Civ. P. 65(a), as made applicable to this proceeding under Fed. R. Bankr. P. 7065, but only on notice to the adverse party. Rule 65 requires the plaintiff to show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008).

26.

Here, Defendant's attempt to block the Debtor's employment opportunities is undermining federal bankruptcy law. Without an injunction, the purpose of Title 11 will become null, as the Debtor will lose a valuable asset and sole means of income. Debtor's counsel shows that even though no request for a temporary restraining order has been made, he has notified WCS, through its agent for service of process, via U.S. mail, and its attorney, who has identified himself as representing WCS against Mr. Worley, Benjamin Naftalis, via fax to his office of the date, time and location of the hearing on this Motion as well as all pleadings filed in both the contested matter and adversary proceeding.

**WHEREFORE,** the Debtor prays that this Honorable Court order Defendant to show cause, if any it can, why a preliminary injunction should not be granted herein enjoining any attempt by Defendant from enforcing its Restrictive Covenants contained in the Employment Agreement and Separation Agreement, until a final hearing can be held on the permanent injunction; that this Court enter all further orders that it deems appropriate; that this Court enter any and all further orders to prevent the frustration of its orders in this captioned matter, and otherwise necessary to aid in the Court's jurisdiction and orderly management and disposition to final resolution of the captioned matter.

Respectfully submitted,

By: s/ Scott H. Crawford
SCOTT H. CRAWFORD (#4585)
8702 Jefferson Hwy., Ste. B (70809)
P.O. Box 3656
Baton Rouge, Louisiana 70821
(225) 343-5290 - Telephone
(225) 383-5508 – Facsimile

Attorneys for Michael Allen Worley, *Plaintiff*

- AND -

By: s/ Arthur A. Vingiello
ARTHUR A. VINGIELLO, *Of Counsel* (#13098)
THE STEFFES FIRM, LLC
13702 Coursey Blvd., Building 3
Baton Rouge, Louisiana 70817
(225) 751-1751 – Telephone
(225) 751-1998 – Facsimile

Attorneys for Michael Allen Worley, *Debtor*